The next case, number 23-1043, Dan and Jay Patel et al. v. 7-Eleven, Incorporated. At this time, would counsel for the appellants please introduce yourself on the record to begin? Good morning, Your Honors. I'm Shannon Liss-Riordan for the plaintiffs. I will be sharing my time today with the Commonwealth. I'm taking ten minutes and the Commonwealth is taking five, but I'd like to request two minutes for rebuttal. You may have two minutes. Thank you. So, Your Honors, as this Court is well aware, this case has been here before. This is déjà vu all over again. All over again. This Court certified to the SJC a significant question, and the SJC answered a very significant question and issued a significant ruling. After the case went back to the District Court, the District Court came up with a completely new, made-up, first-of-its-kind way to get rid of this case again. That's not fair to the District Court because in fairness, Judge Horton in his original decision mentioned that this was a possible theory for application. In this case, he just didn't reach it because he felt he could decide that on another theory. But to imply that he made it up and it's entirely new, those are just incorrect statements. No, no, no. What I meant by that is that I'm not aware of any other court that has thrown out a case on this basis. The question about whether services are provided has been determined to be such a low threshold, if it is a threshold at all, that no other court has thrown out a misclassification case on that basis. Why don't you tell us what services are provided because I'm in a quandary about that. What services are provided to 7-Eleven? Well, the services provided to 7-Eleven, frankly, are the same types of services that employees provide employers. What services? Just identify the services. Yes. So the franchisees run the stores. They manage the stores. Now, wait a minute. Some of the franchisees are corporations. But they still work at the stores. They still manage the stores. The corporations work in the stores? I don't follow that. Well, the Attorney General's Office, which the SJC has repeatedly said gets deference, has said, and it was in the Depionte decision by the SJC, that the fact that some plaintiffs have incorporated or set up LLCs does not mean that they can't be misclassified under Chapter 149, Section 148B. And most law courts, including the Tenth Circuit, have recognized that franchisees may be incorporated. Figure out who you say are employees here. You say the individual franchisees are employees. Yes. You say that where there are corporate franchisees, the owners of the corporations are employees? Yes. Excuse me. And what about the people who work in the stores? Are they employees of 7-Eleven? Or just aren't they involved in this case? They're not involved in this case. There's no dispute that they're not involved in this case. There are some franchisees who don't have corporations and who don't have LLCs. I was just pointing out that multiple courts have recognized that even when a plaintiff in a misclassification case has incorporated or formed an LLC, that doesn't mean that they're not employees. The Tenth Circuit addressed that in a case brought by the Department of Labor in Janikin, recognizing the fact that some of the franchisees had incorporated or formed LLCs did not mean that they could not be employees. And, in fact, in multiple cases involving cleaning franchises that the SJC has addressed, Coverall District Court has addressed, Janikin, and other cases, some of the franchisees incorporate or set up LLCs. That is not a bar to them being determined to be employees. In your brief, you say the service they provide is running the stores? Yes. Well, that's the answer to Judge Shelley's question. Yes. So franchisees work in the stores. Franchisees sell products to 7-Eleven's customers. They're not 7-Eleven customers. They're customers of that particular store. Well, not necessarily, Your Honor. This is just assuming certain facts that haven't even gotten into this record here. But 7-Eleven, they have an app that they use. This isn't even in the record. What you're asking, I know the answer, but it's not in the record. Wait a minute. Let's limit ourselves to what's in the record. Sure. What's the evidence that shows that when someone comes into one of your stores and buys a can of soup, that that person is a customer of corporate 7-Eleven rather than a customer of the particular 7-Eleven store, which is a separately incorporated or a separate business? Well, when a customer walks into a Starbucks and orders a Frappuccino, what's to say that they are a customer of Starbucks as opposed to that particular store? Corporate entities— Because Starbucks owns all its stores, so the issue never comes up. Well, 7-Eleven owns and directly manages some of the stores. That's true. And in those stores, I have no doubt that the people who work there are employees. But we're talking about stores that 7-Eleven neither owns nor manages, but which it franchises out. And in a franchise store, I have a struggle with the notion that my soup buyer is a customer of what I'll call Big 7-Eleven. So, Your Honor, I think this is—it gets kind of circular if you're saying that just because someone is designated as a franchisee, they can't be an employee and the customers are necessarily theirs. I'm not talking about an employee. I'm talking about a customer. Right. Okay. Because I'm just saying, like, in the cleaning franchise cases, again, we're in multiple courts. Cleaning franchise cases are different because they are the customers that are being supplied to the franchisees, and you can look right through that franchise and see that it's a manipulative device. But that's not true. I mean, this looks like, from what I can tell from the papers, it looks like a genuine franchise. Now, maybe I'm wrong. Maybe there's something that I haven't appreciated in this franchise agreement or in the way this operates, that this is a sham or this is manipulative, like the cleaning franchise. That would change my thinking. Well, Your Honor, 7-Eleven does the advertising. It sets up the promotions that the store does, that we're going to have a sale on root beer next week. It provides the operations manual for how the franchisees must run the stores, and it's really no different from the cleaning franchise cases where the company provides the system under which the workers get their work. And so essentially what the district court was saying here, if the district court's decision was correct, then no franchisees are employees. But that's exactly what the SJC rejected in its decision in this case. But I think you're mischaracterizing the district court opinion. I don't think the district court said no franchisees are employees. I think the district court's opinion has to be read in connection with this franchise. I just told you, I think, and I suspect Judge Borton would think, that these sham franchises, cleaning contractors are the quintessential example. They're a different breed. Now I'm talking about what, in the commercial marketplace, we've come to regard as accepted franchises, 7-Eleven, Dunkin' Donuts. There are many. Yeah, there are many. And I, in that type of authentic franchise relationship, I struggle with the notion of what service is being rendered by the franchisee to the franchisor. I've read the franchise agreement. It seems to me the franchisee is an entrepreneur who is running the store for his benefit. Yes, 7-Eleven gets a piece of the profits. That's called a franchise fee. But to say that running the store is a service to 7-Eleven is something I'm having trouble getting my mind around. Your Honor, I know my time is now up, but if I could say a few words, please. There's no difference here between the franchisees and the store managers who are acknowledged employees who run the corporate-owned 7-Eleven stores. We're only talking here about franchisees who actually worked in the stores. They provided services to 7-Eleven the way any employee provides services to an employer. And there are a host of differences between 7-Eleven and other franchises that you're thinking of, Dunkin' Donuts, Subway, et cetera. Here, 7-Eleven controls the bank account. And in the franchise agreement, contrary to what the district court said, the franchise agreement says, we pay you. We, 7-Eleven, pay you. And what happens is the customer revenues come into this 7-Eleven-controlled bank account, and the employees, the franchisees, are paid based on what is allowed by 7-Eleven, and 7-Eleven takes it. That's not what a typical franchise. Typical franchises, the franchisee actually runs their business. They hold the licenses. They control the bank account. They send a payment off to the franchisor, usually 3 or 4 or 5 percent. Here, 7-Eleven controls the bank accounts and says, half of this is ours, half of this is yours. This is not like a typical franchise. Could you clarify your understanding of the structure of the franchise fees? So does the amount received by 7-Eleven fluctuate based on the franchise's profits, or does it take some sort of percentage of those profits and then the franchise fee is a flat one? So what happens is the franchise, there's something that 7-Eleven calls a 7-Eleven charge. That is typically half of the revenues that come in go to 7-Eleven. Half of the revenues are designated for the franchisee, but then all types of deductions are taken out of the franchisee share. So this is like in Sebago, the issue that the SJC made a point of was distinguishing cases where the defendant just simply acted as a lessor who took a flat rate as opposed to one who was dependent on the amount of revenues that were being brought in by the plaintiffs. So here it's the latter. 7-Eleven does better when the franchisees do their jobs and a lot of sales are made in the stores. So 7-Eleven is not at all indifferent to the revenues that are being brought in by the franchisee. Once again, I want to emphasize what this court specifically recognized earlier in this case is these are very important policy decisions about Massachusetts law, which is considered to be one of the most stringent in the nation on misclassification. So if this court has any doubt because the district court's decision is novel and that I'm not aware of any case that's been thrown out on this basis before, I would urge the court to again certify this to the SJC because I do think that the district court came up with another reason to get rid of this case, but it did so on a basis that doesn't have any precedent. And if this decision is allowed to stand, it will upend the enforcement of the independent contractor law throughout the economy because every defendant is now going to argue that the services inquiry is some kind of important, hard-to-meet threshold. Again, in the cleaning cases, the SJC in the 2006 coverall decision went straight to saying, applying the ABC test, understanding that the services were performed. So in terms of your thinking about sending something to the SJC, are you saying because the SJC did say that an inquiry is the franchisee performing a service, so are you saying that too much emphasis has been placed on whether that is indeed a threshold question that the SJC should be allowed to answer or whether it should be even termed a threshold question? Or is it the weight of that question? Is it a minimal showing? How would you frame an issue were we to do that? Well, I think it's the way that it is applied because, again, I think the SJC from its decision, if you read the decision, it seemed clear that it expected the next step in the case would be the district court to apply the ABC test. You can't walk away from that decision thinking that there was going to be some big analysis that preceded that. The argument that the district court accepted below, again, if accepted, would upend the enforcement of the misclassification law throughout the Commonwealth because it is essentially saying that in any situation where there is a contract, where someone is designated as a franchisee or as an independent contractor and where it says you have your own business and you have your own customers and all we're doing is providing you an operations manual and backup support, that would allow any employer to get away with claiming that they're not employees, that they're not liable under the wage laws. That would be a significant impediment to enforcing the independent contractor law. So I think the way that the, I don't think the SJC intended at all that, essentially the district court's decision would mean that no franchisee could be an employee and that goes against what the SJC said. It still doesn't quite get it how you would frame the question. So the question may be, and I believe the Commonwealth is going to speak on the issue about the unidirectional inquiry as to whether or not services are provided by the alleged employee, but I think the question would be how the court is to analyze that threshold inquiry. What factors are considered in determining whether services are provided for the alleged employer? Is it different from, essentially from the B-prong? Because the way the SJC discussed this, and it's a confusing issue in the Sebago decision, the discussion of the B-prong somewhat conflates with the very issue that we're talking about because their reference to the two Illinois cases involving the limo companies, we're talking about whether services were provided, but they talked about it in the context of the B-prong. So I think the exact wording of the question we can think about, but I do think that there's a serious concern here if the district court's decision is allowed to stand and now become the law of the land based on a First Circuit affirmance without the SJC weighing in. You're well over your time. Thank you. Thank you, counsel. At this time, counsel for the Commonwealth will introduce himself on the record to begin. Good morning. May it please the court, I'm David Kravitz on behalf of the Commonwealth. We ask to participate in this case because the issue that the case presents is extremely significant. The threshold inquiry, as has been discussed, is at issue in literally every misclassification case that is brought in the Commonwealth, whether by the Attorney General or by private parties. And the approach that the district court took in this case is inconsistent with the text of the statute. It is inconsistent with the purpose of the statute, which the SJC has repeatedly told us is a remedial statute that has to be liberally construed to protect workers. And it threatens to complicate and ultimately limit the ability of the Attorney General to combat the problem of misclassification. Misclassification hurts workers by denying them benefits they're entitled to. It hurts businesses that play by the rules because it sets up an unfair competitive disadvantage. And it hurts the state and the federal governments who are deprived of revenue that the companies that do misclassify should be paying in. So the district court made two fundamental mistakes in this case. And the first error was to give any consideration at all to the services that 711 purportedly is providing to the plaintiffs. That is simply irrelevant to the threshold inquiry. And the statute is very clear on this. The statute says an individual, the employee, are they performing any service for the putative employer? And that's it. There is no opportunity or latitude in the statute to consider whether the employer might also be providing services back to the employee, which of course most employers do in one form or another. And so as my colleague said, the statute at the threshold sets up a unidirectional inquiry. Is the employee performing any service for the putative employer? And that is the end of the inquiry. So any consideration that the district court gave to the services coming the other way, whether it was sort of by way of a balancing test or as a way to sort of preemptively determine that this was a legitimate, quote, unquote, legitimate franchising relationship, is simply not relevant. And any consideration given was improper. The second error that the district court made was in failing to appreciate that, as Judge Selya mentioned, there is a portion of the revenue from the stores, that is the work that the plaintiffs are doing, that goes directly into 7-Eleven's pockets. And that is enough under the existing SJC case law to constitute performing a service. And in my brief remaining time, I'd like to make a point that comes from the SJC's Sebago decision, which in our view essentially resolves this issue in the plaintiff's favor. And this is with respect to the medallion owners in Sebago. The medallion owners were not paying the drivers for anything. And nonetheless, the district court here held, and 7-Eleven is now arguing, that performing the service inquiry has to mean the employer is paying the employee for services rendered, so work for pay. We know that can't be right because of the way the medallion issue was dealt with in the Sebago case. Again, excuse me, the medallion owners were not paying the drivers for anything. And so if that were the inquiry, if it were work for pay, the SJC would simply have said, well, they're not paying them for anything, so they're out of the case. That's it. In fact, what the SJC did was undertake a careful and sort of nuanced analysis of the relationship between these parties. It said it looked at the leasehold payments, and it said those payments are not enough because they are flat fees that do not depend on the work of the drivers. Whether you're driving a cab every day or it's sitting in the garage for a month, the fee is still the same. But then really significantly, it looks at the possibility of advertising being sold on the cabs. And the SJC there says if the record were to bear out that the medallion owners are selling advertising and that the drivers, by driving their cabs around the city so that people can see it, are increasing the value, that, the SJC says, arguably could constitute a service. And then they go on to apply the ABC test. So, again, if the work for pay test were correct, there's no reason that the SJC would have engaged in any of that inquiry. It would simply have said they're not paying the drivers, and so they're out of the case. I have only about 20 seconds left, so let me just wrap up by saying we do think that the error of the district court in the way it analyzed the threshold inquiry is clear enough that you can simply reverse based on existing SJC case law and send it back for application of the ABC test. But if you think that there's any doubt that the SJC has already resolved this essentially in favor of the plaintiffs, then we do urge that the SJC should be the one to answer the question because it is, for the reasons I stated at the outset, a very significant question of Massachusetts law. Thank you for hearing me today. Thank you, counsel, at this time. Counsel for Appley 711 should introduce himself on the record. Good morning, Your Honors. Norman Leon for the Appley 711, and with me is Matthew Iverson. Your Honors, the Commonwealth began by saying that the only question before the court is whether or not the franchisees provided any service for 711, and we agree. The problem with the plaintiff's case here and with the Commonwealth's argument is they still have not identified any service that the plaintiffs actually provided for 711. What if the service is running the store? If that's the case, Your Honor, then every single franchisee in the Commonwealth is a presumptive employee of their franchisor, and that is exactly the result that the SJC said was not an appropriate result, that legitimate franchise relationships in the Commonwealth, and there is no dispute that this is a legitimate franchise relationship, are not impacted by the independent contractor statute. Now, I want to address Sebago because on that point with the Commonwealth, I agree. This case ends with Sebago. Doesn't it have to be more nuanced than that, though? I mean, you can run the store, and then you can run the store. I mean, doesn't the district court have to make a determination as to what that means as a service? What, in terms of running their business, Your Honor? Running the store, running the business. Running their business. If running a business is a service that's provided, then every party to a commercial contract that runs their business is a presumptive employee. That can't possibly be the meaning of the independent contractor law. The meaning of the independent contractor law is because of what I'm asking is, does it depend upon how the setup is organized? I mean, obviously you have managers who run stores, 4711, who just get paid to do a thing. This is a much more complicated organizational structure, but it doesn't mean that the way it's set up isn't also running the store, even though it's a different organizational structure. I don't think it's complicated at all, Your Honor. Just like every franchise relationship, these franchisees purchase a business from 7-Eleven. They have the right to work in the store. But the SEC has said that some franchisees can also be employees, and so it can't be as simple as you're saying. Some franchisees can be employees of their own corporations, but there are no franchisees that are employees of 7-Eleven. I think this case is answered by Sebago. In Sebago, the SJC made crystal clear that providing an economic benefit to another party, such as by paying pursuant to a lease or a license, as in this case, and despite what plaintiffs are telling you today, that is the only service they claimed in their brief in this court they provided to 7-Eleven. That is not a service for purposes of the independent contract of statute. Much as they may try to convince this court otherwise, that is the essential takeaway from Sebago. A putative worker providing money to a putative employer does not constitute a service. If it did, then the medallion owners in Sebago would have had to be the putative, presumptive employer of the cab drivers because the cab drivers gave money to the medallion owners. There's no other possible conclusion. The garage owners also would have had to be the presumptive employers of the cab drivers because the cab drivers gave the garage owners money for servicing their cabs, but the SJC came to the exact opposite result. From an economic perspective, this is a simple issue despite their attempts to complicate it because 7-Eleven economically is no different than the medallion owners that the SJC held in Sebago as a matter of law were not presumptive employers. 7-Eleven owns several things. It owns real estate, it owns equipment, and it owns intellectual property consisting of trademarks and an operating system. It leases those things to its franchisees for a fee. It's undisputed that that's how the relationship works, and that's at JA 3259, paragraph 124. That is exactly the relationship that the SJC held is not an employment relationship. This is no different. The complicating factor here, Mr. Leon, at least for me, is the fact that 7-Eleven seems to control the flow of money through this bank account. Does that in any way change the equation? Not at all, Your Honor, and I think plaintiffs misunderstand the way that the banking system works. Maybe you'd better explain it to us. There is an open account, which is effectively a working capital account. The money that 7-Eleven quote-unquote pays to franchisees, and the franchise agreement does use the word pay, I acknowledge that, is the franchisees' own money. That money is put into this account and is held in that account. 7-Eleven remits it to the franchisees whenever they want, subject only to the requirement that a minimum amount called the net worth requirement remains in that account to secure 7-Eleven's investment in the store. 7-Eleven advances, it fronts the cost for acquiring the inventory, so it's a secured party. But the money in the account belongs to the franchisee. Your Honor, if I could make one point. So that account is security for 7-Eleven's advance? Correct, Your Honor. It is actually an undisputed fact on this record. If Your Honors look at JA 3260, paragraph 126, the plaintiffs conceded, and again, we're here on a summary judgment record. They conceded at summary judgment that all of that money minus the 7-Eleven charge that franchisees are obligated to pay to 7-Eleven under the franchise agreement belonged to the franchisees. Now, as to the plaintiff's contention that this would bring about some misclassification apocalypse, that even the cleaning franchisees in the coverall cases would now be independent contractors, that's just wrong because this case is the exact opposite of those cases. In those cases, and it's the same thing with the radio associations in Sebago, what happened is that the putative employees provided services directly to either the employee or, or the employer's clients. The radio associations, for example, they went out and they sold vouchers for cab rides to their customers. Their customers turned in those vouchers for a service, a cab ride provided by the cabbies, and then the revenue which came from the customers to the radio associations was paid by the radio associations to the cab drivers. Again, the cab drivers provided a service to the radio associations' customers. In the cleaning franchise cases, it was the exact same thing. The franchisor went out and got clients. The cleaning franchisees cleaned those clients. The franchisor billed the clients, got the money, took its cut, and paid the balance left to the franchisees. Again, service was being provided by the franchisees directly either to the employer or to the employer's customers. This case is the exact opposite. That's why their reasoning is not just wrong. It turns Sebago on its head. These people, these franchisees, they sold their product to their customers and they earned money. So who are 7-Eleven's customers? Are they the franchise owners or are they the people buying the products? 7-Eleven's customers are the franchisees to whom they sell franchises. That's 7-Eleven's business. It's in the business of selling and supporting franchises. And then what expectations does 7-Eleven have for the franchise owners? So are they expected to run their stores in a way that, say, builds the brand of 7-Eleven? Absolutely. Just as with every franchise system, Your Honor, they're supposed to run their businesses in a manner that protects and promotes and preserves the brand. And that's why you give them the operations manual, right? Just like every other franchisor, Your Honor. And, again, it's an undisputed fact on this record that these features are features of every traditional franchise system. Now, counsels attempted to distinguish this case from other cases saying, well, this is a graduated fee. They don't pay a flat fee like the fees that were paid to the medallion owners in the Sebago case. That doesn't make a difference. It's an undisputed fact on this record, and this is a JA 514, that every traditional franchise system, that includes Dunkin' Donuts, Your Honor, McDonald's, all the hotel companies, Domino's Pizza, Burger King, Pizza Hut, you name it, they all get paid a graduated fee based upon their franchisee sales. That is the essence of the franchisor's investment in their franchisee's success. If they were right that the mere payment of a graduated fee was enough to transform a commercial relationship into an employment relationship, then every commercial copyright agreement, every patent license agreement, those would all be presumptive employment relationships. And we know that's not the case. Now, I do want to talk about the commonwealth's textual argument a little bit, and I guess the first point I would like to make to the court is that I don't think the court should consider it because it was not raised below. The plaintiff's argument is in no sense a variant on what the commonwealth. But the question of service is before the court, right? I mean, that's really what we're looking at. Absolutely, Your Honor. It is before the court. But the assertions made here that the district court somehow erred by not conducting this textual argument, that was never raised. So it's a bit unfair to accuse Judge Portman of committing error when he didn't do something that nobody ever asked him to do. Well, and we also have several cases that say an amicus can't introduce issues into a case that a party hasn't raised. It seems to me that would come into play, too. If the court was to consider it, and, again, I understand your point, Judge Selya, I think it should be disregarded out of hand, the notion that providing some benefit is enough to constitute the service required under the independent contract law. If that was the case, then everybody that volunteered their time at Habitat for Humanity would be a presumptive employee, and because Habitat for Humanity exercises significant control over what its volunteers do, it would be the employer of all of its volunteers. Same thing for people that volunteer at Legal Aid. They are in the legal business as Legal Aid is. That means they would fail prong B, and Legal Aid would be their employers. The last point I want to make on the Commonwealth's argument is that it's not just that it would turn every person that provides a benefit into a presumptive employee. It would likely convert every party to every commercial contract into a presumptive employee, and I want to explain this because I think it's important to understand how far afield the Commonwealth has gone on this. Every contract is required to have consideration. Some benefit flows from each party to the other. It could be money or it could be a service. That's the essence of every contract. The Commonwealth has taken the position that merely providing a benefit is enough, a favor is enough. That's a service. If that's true, then every party to every commercial contract is the presumptive employee of the counter-contracting party and at the same time the employer of the counter-contracting party because they are receiving a benefit. So we know that their proposal cannot be right. We know it also can't be right because Sebago tells us it's not right. In Sebago, the cab drivers paid money to the medallion owners. That's certainly a benefit. If merely providing a benefit was enough to trigger the services requirement under the independent contractor statute, then Sebago got it wrong. So I don't think that there's any middle ground on that. One last point on the money issue, Your Honors, and the cases that the plaintiffs rely on. The analysis that the courts undertake, and I think it's the one that this court should take as well, is really follow the money. In every single case that they've cited to this court, in every case that they've discussed, the putative employee provided a service to the putative employer or its clients and received money for doing that. That is the same fact that differentiated the radio associations from the medallion owners in Sebago. Again, the radio associations sold vouchers, their clients used those, and the people that gave the rides got paid for doing that. That's the exact same fact pattern in the franchise cases that counsel discussed. Here, as the district court correctly found, and there's nothing to contest this on the record, the money flows the opposite way, which is why the plaintiff's argument just can't be right. Employees provide services for compensation. Employers don't. Employers pay employees for providing services. 711 doesn't pay its franchisees anything. The district court was unquestionably correct on that. Franchisees pay 711 for providing services. If you apply the follow the money analysis, the common sense analysis that employees get paid for providing services, there is no service provided here by these plaintiffs. If anybody is an employee here, it's 711, because it's the one that provides services to the franchisees. Judge Gorton didn't engage in any weighing analysis. He didn't delve too deeply on whether or not 711 was providing services to the franchisees. He simply referenced those facts to point out that the plaintiffs didn't provide any services to 711. 711 provided services to them, unless the court has any additional questions. Thank you. Thank you very much. Thank you. Thank you, counsel. At this time, counsel for the appellants, please reintroduce yourself on the record for your rebuttal. Shannon Lestraden for plaintiffs. Counsel for 711 just got Sebago flatly wrong. He just said that the medallion owners were not presumptive employers. Read Sebago. The medallion owners and the radio associations were presumptive employers. The SJC went ahead and applied the ABC test because that initial threshold inquiry was so low. And the issue about the flat lease payment, the fact that ultimately the SJC on a nuanced analysis found that the ABC test was satisfied by both of those sets of defendants, the question about whether or not the payment was a flat payment versus varied depending on how much revenue the plaintiffs brought in, that was part of the prong B analysis, not the initial inquiry. 711 says in its franchise agreement, and it concedes in the briefs, and Mr. Leon earlier in his argument conceded 711 pays the franchisees. But then he just ended his argument by saying 711 does not pay the franchisees. It's in the franchise agreement. 711 pays them. Look at other recognized employment relationships. Waiters get their money from customers. They'll often in cash institutions, which used to exist, still sometimes exist, the waiters bring in the money. They actually collect the money from the customers, and then they reconcile it out with the restaurant at the end of the night. Strippers, who have uniformly been held by the courts to be employees, take the money directly from the customers, and then they pay out what the club gets. They've been held to be employees. In the Cary case, if you look at the Massachusetts Appeals Court decision, where newspaper delivery drivers were held to be employees, they actually buy the newspapers from the paper and then resell them to customers, and they were held by the Massachusetts Appeals Court to be employees. The banking system that 711 uses, 711 owns the account. It's in the name of 711. It controls it. It sets it up. It allows the franchisees with permission to take draws from it. The money in it may belong to the franchisees because by contract they get a certain amount, but those bank accounts belong to 711, not the franchisees, and that is a significant difference between the 711 system and other franchises with which we're all familiar, Dunkin' Donuts, Subway, McDonald's, et cetera. Your time is up. Thank you, Your Honor. Thank you, counsel. That concludes argument in this case.